# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DAVID JOHNS BRYSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No. CIV-05-1150-F |
| | ) | |
| ROBERT H. MACY, individually, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED ORDER

Before the court are Defendant City of Oklahoma City's Motion for Summary Judgment, filed January 8, 2009 (doc. no. 105), Defendant Robert H. Macy's Motion for Summary Judgment, filed January 9, 2009 (doc. no. 107), and the Motion for Summary Judgment by Defendant, Joyce Gilchrist, filed January 9, 2009 (doc. no. 110). Upon due consideration of the parties' submissions, the court makes its determination.

## I.   Background

Plaintiff, David Bryson, spent over 17 years in prison for crimes – kidnaping, rape and sodomy – that he did not commit. Plaintiff seeks damages under 42 U.S.C. § 1983 against defendants, City of Oklahoma City, Joyce Gilchrist, and Robert Macy, for malicious prosecution and for bad faith denial of post-conviction access to potentially exculpatory evidence. Both of these claims arise under the due process clause of the Fourteenth Amendment. Plaintiff also seeks damages under Oklahoma state tort law against defendants Joyce Gilchrist and Robert Macy. All defendants

seek summary judgment as to plaintiff's § 1983 claims.  Defendant, Joyce Gilchrist, seeks summary judgment as to plaintiff's state law claim.

II.   Standard of Review

Under Rule 56(c), Fed. R. Civ. P., summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  The moving party has the burden of showing the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  All reasonable inferences to be drawn from the undisputed facts are to be determined in a light most favorable to the non-movant.  United States v. Agri Services, Inc., 81 F.3d 1002, 1005 (10th Cir. 1996).  Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial.  Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

III.   Relevant Facts

The facts, undisputed or viewed in a light most favorable to plaintiff, are as follows.

A.   Plaintiff's Conviction

On September 23, 1982, Theresa Taylor, a 23 year-old, was kidnapped in downtown Oklahoma City and driven to a remote location in the southeast part of town.  During the drive, she was forced to perform an act of fellatio.  Upon arrival at the remote location, Ms. Taylor was dragged out of the car into a muddy ravine.  The

assailant, who carried a knife, then raped and orally and anally sodomized Ms. Taylor. City's Ex. 17, pp. 3-23; City's Ex. 18, pp. 36-66.

Thereafter, the assailant ordered Ms. Taylor to perform another act of fellatio. When she felt the assailant becoming erect, Ms. Taylor "bit down very hard, and as hard [she] could" on his penis. She "felt blood come into [her] mouth." City's Ex. 18, p. 61, ll. 7-9. The assailant screamed and dropped the knife he was holding. Through clinched teeth, she ordered the assailant to his side and ordered him to put his hands underneath his side so they could not reach the knife. *Id.* at p. 61, ll. 10-19. She bit the assailant's penis one more time and took off running. *Id.* at p. 62, ll. 2-5.

Ms. Taylor ran nude to the home of Air Force Major and Mrs. Kuritz. Mrs. Kuritz gave her a robe and Major Kuritz called the police. City's Ex. 17, p. 27, ll. 1-3; City's Ex. 18, p. 64, ll. 2-10. Ms. Taylor was interviewed briefly by the police and taken by ambulance to Oklahoma Memorial Hospital, where she was examined by Dr. Suzanne Bergen. City's Ex. 18, p. 64, ll. 11-24.

Detective Julie Smith was assigned to Ms. Taylor's case. Detective Smith had Ms. Taylor assist a sketch artist in providing a drawing of the assailant. A radiogram was issued giving a description of the suspect, the clothing worn and information that the suspect had been bitten on the penis. City's Ex. 18, p. 226, ll. 22-25; City's Ex. 87; City's Ex. 22.

On September 24, 1982, evidence collected from Ms. Taylor and the crime scene was submitted to the OCPD forensic laboratory. The evidence collected from Ms. Taylor included a vial of blood, oral washing, vaginal aspirate, saliva sample, two vaginal swabs (posterior fornix), two vaginal swabs (cervix), vaginal slide, two rectal canal swabs, rectal canal slide, scalp hairs, pubic hair combing, pulled pubic hairs, two swabs from bite area – right arm, fingernail scraping, leaves and grass taken from victim's hair, one torn fingernail and one robe. The evidence from the crime scene

included one torn brown skirt, one brown belt, one beige blouse, one white bra and a paper "bindle" containing hairs.  City's Ex. 29.

On September 27, 1982, Detective Smith requested the Oklahoma City Police Department ("OCPD") forensic laboratory to analyze the evidence.  Defendant, Joyce Gilchrist ("Gilchrist"), a forensic chemist for the OCPD, was assigned the case.  The case number was "ST-82-336."  City's Ex. 20; City's Ex. 17, p. 103, ll. 9-10; City's Ex. 29.

On the same day, Detective Smith requested a group of rape crisis volunteers to contact every medical facility in the metropolitan area and give a description of the suspect and a brief synopsis of the injuries that the suspect had sustained.  City's Ex. 22; City's Ex. 18, p. 231, ll. 8-15.

On October 2, 1982, plaintiff, David Bryson ("Bryson"), called Dr. Patskowsky's office to obtain a prescription for an infected penis.  Because Dr. Patskowsky was not working that day, he was referred to Dr. Patskowsky's partner, Dr. Tillinghast.  Dr. Tillinghast spoke to Bryson and wrote him two prescriptions – one for a painkiller and one for an antibiotic.  City's Ex. 18, p. 353, 376-77; City's Ex. 21.

Shortly thereafter, Dr. Tillinghast advised the rape crisis group of Bryson's injury.  The group then called Detective Smith and advised her of Bryson's injury.  City's Ex. 22.

On October 5, 1982, Bryson, who was twenty-eight years old, was arrested for outstanding warrants for various traffic offenses and was held as a suspect in the rape of Ms. Taylor.  City's Ex. 24, pp. 9-11, 80-81; City's Ex. 25; City's Ex. 17, p. 54, ll. 7-11.  His injured penis was photographed by OCPD officer Ed Johnson.  City's Ex. 18, pp. 272-276.

A photographic lineup was prepared by Detective Smith, which included a photograph of Bryson as photograph number 3.  City's Ex. 26.  Ms. Taylor tapped a photograph below Bryson's photograph and stated that the face was the right shape and the beard looked right but that he was not the man.  She continued to look at the lineup and told Detective Smith that number 3 (Bryson) was the man.  Bryson's Ex. 90, p. 58, ll. 22-25, p. 59, ll. 1-4.

On October 6, 1982, blood, saliva and hair evidence collected from Bryson was submitted to the OCPD forensic laboratory.  City's Ex. 29.

On October 8, 1982, an information was filed in Oklahoma County District Court, Case No. CF-82-5031, charging Bryson with kidnapping, first-degree rape, two counts of oral sodomy and anal sodomy.

On October 15, 1982, evidence collected from Ms. Taylor's fiancé, Daniel Kalina, was submitted to the OCPD forensic laboratory.  City's Ex. 29.

James Pearson ("Pearson"), an Oklahoma City attorney, was retained by Bryson's father to represent Bryson in the criminal proceedings.  Bryson's Ex. 86, p. 17, ll. 4-25, p. 18, ll. 1-11.  On November 10th and 18th, a preliminary hearing was conducted.  The prosecution called Ms. Taylor and Detective Smith and rested. Pearson, on behalf of Bryson, moved to dismiss the case for lack of probable cause. The motion was overruled.  City's Ex. 17.  During his presentation, Pearson called Gilchrist as one of his witnesses.  Gilchrist testified that she had not completed her hair comparison analysis but had done some preliminary blood work.  After Pearson completed his presentation, the trial court denied a renewed motion to dismiss and Bryson was bound over for trial.  *Id.*

On January 10, 1983, a "pot pipe" was submitted to the OCPD forensic laboratory. City Ex. 29.[1]

By January 28,1983, Gilchrist had finished her forensic work and had written her report. In her report she stated that "[o]ne (1) pubic hair taken from the torn brown skirt (Item #18) is consistent in microscopic characteristics with the pubic hairs (Item #31) obtained from David John Bryson, and therefore could have come from Bryson." She also stated that "[o]ne (1) scalp hair taken from the blouse (Item #20) and three (3) scalp hairs from the crime scene (Item #22) are consistent in microscopic characteristics with the scalp hairs (Item #25) obtained from David John Bryson, and therefore, could have come from Bryson." City Ex. 29, p. 4.

In the report, Gilchrist found that Bryson was a ABO blood type B and a secretor. She also found that Ms. Taylor was an ABO blood type O and a secretor.[2] She concluded:

> The majority of seminal stains encountered in case work are as a result of vaginal drainage and therefore will be a mixture of semen and vaginal secretion. When interpreting the results of grouping of these stains, it must be assumed that any blood groups which are consistent with the female did, in fact, originate from her.
>
> Since the rape exam was not done until several hours after the assault, two (2) possibilities must be taken into consideration: 1). That most or all of the seminal fluid may

---

[1] Ms. Taylor testified at the preliminary hearing and at trial that the assailant forced her to smoke what she believed to be marijuana from a pipe. City's Ex. 17, p. 19, ll. 7-12; City's Ex. 18, p. 48, ll. 24-25, p. 49, ll. 1-3.

[2] A secretor is a person who secretes his or her ABO blood group substances together with H substance into his or her body fluids (*e.g.* semen, saliva, vaginal secretion, etc.). A "B secretor" will secrete B plus H and an "O secretor" will secrete just H. A non-secretor is an individual who does not secrete his ABO blood group substances into other body fluids. Bryson's Ex. 21, p. 4.

have been lost prior to the exam (even though sperm may be present), and 2).  That the semen donor is a low level secretor in his seminal fluid.

The semen found in the vaginal aspirate and on the vaginal swaps contain only the H Substance.  However, the B substance was detected by the more sensitive absorption - elution test.  The B substance was also detected on the rectal swabs.  The B and H substances were detected in semen stains from the robe.  The H substance therefore, could have originated from the victim (Taylor) and the semen donor is therefore a B secretor.  The semen could have originated from Bryson .  In this case both Taylor and Bryson are the same PGM type (i.e. 2-1)[3], therefore, no conclusion as to the PGM type of the semen donor can be drawn.

* * * *

ABO grouping tests done on the blood and saliva samples obtained from Thomas and Katherine Kuritz show that Thomas is a B secretor and Katherine is an O secretor.  Both Thomas and Katherine have the same PGM type (i.e. 2-1).  Therefore, the semen stains on the robe could have originated from the Kuritz's.  However David Bryson can not be excluded as the semen donor.

City's Ex. 29, pp. 3, 4 and 5.

On February 7, 1983, the OCPD forensic laboratory released the evidence to Detective Smith for Barry Albert, the Assistant District Attorney handling Bryson's case.  City's Ex. 32.  Bryson's trial commenced on that same date.  City's Ex. 18.

---

[3] PGM is Phosphoglucomutase.  It is a polymorphic enzyme found in blood and some other body fluids such as semen.  Three different forms can be identified: PGM 1, PGM 2-1 and PGM 2. Bryson's Ex. 1, p. A3.

On the first day of trial, hair evidence was produced to Bryson's expert, Max Courtney ("Courtney"), for examination.  Courtney created a chart entitled "Pubic Hair Chart."  City's Ex. 33.  After the examination, Courtney communicated that he could not help Pearson.  City's Ex. 34, pp. 91-92.  However, Bryson's pubic hair contained characteristics which were not listed when Courtney charted the known pubic hair of Bryson.  Bryson's Ex. 52.

During the trial, Ms. Taylor testified and identified Bryson as the assailant.  City's Ex. 18, pp. 96-97.  Marge White also testified and identified Bryson as the man whom she had observed hitchhiking on a road near the time and place of the sexual assaults and who had lunged at her vehicle when it approached him.  Bryson's Ex. 3, pp. 165-186.  In addition, Gilchrist testified consistently with the statements and conclusions in her report.  City's Ex. 18, pp. 309-312.  She testified that the donor of the semen was a B secretor.  *Id.*

After the prosecution rested, Pearson demurred to the evidence and it was overruled.  City's Ex. 18, p. 352.  Bryson testified that he received an injury to his penis after he requested his girlfriend to scrape her teeth on his penis in an up and down motion.  *Id.* at 486.  OCPD officer Ed Johnson had described Bryson's injury during the prosecution's case as "abraised" and "skinned."  City's Ex. 18, p. 274, ll. 16-18, p. 276, ll. 19-24.  Bryson's doctor testified that Bryson's injury was not comparable to the bite injury described by Ms. Taylor.  City's Ex. 18, pp. 358-362.  Pearson presented evidence of an alibi for Bryson through several witnesses.  According to the testimony, Bryson had been at his father's home at 6:30 p.m. and then went directly to a driving school which started no later than 7:05 p.m.  City's Ex. 18, pp. 429-463, pp. 470-472, pp. 545-548.

Bryson's trial ended on February 10, 1983 and Bryson was convicted of kidnapping, first-degree rape, two counts of oral sodomy with convictions on all five counts of the information. Bryson was sentenced on March 4, 1983 to a term of 75 years for the first-degree rape and to a term of 10 years each for the remaining counts of kidnapping, oral sodomy and anal sodomy. The 10-year sentences were ordered by the trial court to be run concurrently, but to be served consecutively with the 75 year sentence. City's Ex. 27.

Bryson appealed his convictions. On September 30, 1983, the court reporter filed trial transcripts and "filed exhibits" with the court clerk. City's Ex. 27. The Oklahoma Court of Criminal Appeals ("OCCA") affirmed the convictions on August 30, 1985. Macy's Ex. 4. Gilchrist is not mentioned in the opinion. However, the opinion states that "[s]erological and hair analysis evidence also linked appellant to the crime." *Id.* Judge Bussey of the OCCA, in a concurring opinion, described the evidence against Bryson as "overwhelming." *Id.*

B.    Denial of DNA Testing

In April of 1988, Pearson approached Gilchrist about the possibility of DNA testing on the forensic evidence in Bryson's case. Bryson's Ex. 86, pp. 140-142, City's Ex. 47. She informed him that he would have to get approval of the District Attorney's office. Bryson's Ex. 86, p. 140, ll. 12-13. Pearson then talked with Barry Albert, the Assistant District Attorney who prosecuted Bryson's case, and he informed Pearson that he would need to talk with Robert Macy ("Macy"), the District Attorney, or Pat Morgan, the First Assistant District Attorney. City's Ex. 47. Pearson wrote a letter to Mr. Morgan and then talked with Macy personally. City's Ex. 47, Bryson's Ex. 86, p. 141, ll. 4-10. Pearson wanted the evidence tested by Lifecodes. City's Ex.

47.  Macy agreed to the testing by Lifecodes and told Pearson to have Gilchrist ship the evidence.  Bryson's Ex. 86, p. 148, ll. 15-20.

Pearson contacted Gilchrist and told her he "wanted to send everything that could be sent for DNA testing."  Bryson's Ex. 86, pp. 140, l. 25, p. 141, l. 1.  Gilchrist responded that "it had been destroyed."  *Id*. at p. 141, ll. 2-3.  Gilchrist wrote a note, dated June 6, 1988, referencing "ST-82-336," which stated: "This evidence has been destroyed as per S.O.P. and therefore, we have nothing left with which to do DNA analysis on as requested by Def Atty Jim Pearson."  City's Ex. 48.  Pearson spent an afternoon looking for evidence in the court reporter's storage area but did not find anything.  City's Ex. 34, pp. 143-147.

In December 1989, Marlene Cannon, a private investigator hired by Bryson's father, found the forensic evidence from Bryson's trial in the District Court clerk's office and inventoried the evidence present.  City's Ex. 51.  On December 4, 1989, Ms. Cannon obtained a court order allowing her access to items 11 & 12 in the rape kit to "examine them."  City's Ex. 27.  Cannon advised Bryson's father of the forensic evidence found and provided a list of the evidence by letter dated January 1, 1990.  City's Ex. 51.

In May 1991, Bryson's new attorney, Jack Pointer, made a request of the Assistant District Attorney that Bryson be allowed access to the forensic evidence for DNA testing, and the request was denied.  City's Ex. 53, p. 27, l. 1-10; p. 85, ll. 6-15.

On January 17, 1992, Jack Pointer wrote a letter to the court clerk requesting him to preserve all evidence in Bryson's case.  He advised that he would be filing in the near future a petition for post-conviction relief.  City's Ex. 55.

C.    Post-Conviction Proceedings

On September 7, 1995, Bryson filed an application for post-conviction relief in the District Court. City's Ex. 56. In the application, Bryson stated that the testimony of Gilchrist was a significant factor resulting in his conviction. He stated that the hair and blood evidence could be subjected to DNA testing which would conclusively prove that Bryson did not commit the acts for which he was convicted. He stated that he would be asking the court to allow an evidentiary hearing and to transport the samples to the DNA lab for analysis. *Id.* The Assistant District Attorney responded to the motion and argued that it should be denied. City's Ex. 27; Complaint, ¶ 51. The District Court denied the application in an order filed November 20, 1995. City's Ex. 57; City's Ex. 27. Mr. Pointer failed to file a petition in error with the OCCA within the time provided by law and the appeal was dismissed. City's Ex. 58.

When Mr. Pointer failed to respond to telephone calls, Bryson's father consulted attorney Jack Fisher ("Fisher"). Fisher discovered that the appeal had been dismissed. In August, 1996, Bryson's father retained Fisher to pursue obtaining the forensic evidence for DNA testing. City's Ex. 59; Bryson's Ex. 87, p. 6, ll. 20-22, p. 266, ll. 11-12.

After being retained, Fisher called Gilchrist and she told him the evidence was on her window sill in her office and that she had been directed to destroy it. Fisher told Gilchrist not to destroy it that he wanted to test it. Bryson's Ex. 87, p. 7, ll. 7-14. On August 28, 1996, Fisher sent Gilchrist a letter and requested that the evidence be preserved for future DNA testing. City's Ex. 61. On September 6, 1996, Gilchrist wrote a note for "ST-82-336" which stated: "As per ADA S. Stensaas, I can ignore this request. The attorney must make any request through the DA's office." City's Ex. 62. Fisher had a conversation with Assistant District Attorney, Susan Stensaas,

11

about DNA testing and she told him that she "would go to jail before she would allow DNA testing."  Bryson's Ex. 87, p. 285, ll. 12-21.

On September 12, 1996, Fisher, on behalf of Bryson, filed an application with the District Court for access to the forensic evidence for DNA testing at Bryson's expense.  City's Ex. 63.

On September 23, 1996, Gilchrist made a handwritten list for "ST-82-336" of "Evidence Returned from DA's storage to Serology."  City's Ex. 64.

On October 2, 1996, a hearing was held on Bryson's application for access to evidence for DNA testing.  City's Ex. 65.  The District Court denied Bryson's application on the basis of res judicata.  The court, however, ordered that the forensic evidence be retained.  City's Ex. 67.

On October 10, 1996, Bryson filed a motion for an appeal out of time with the OCCA concerning the dismissed appeal of the District Court's November 20, 1995 order denying post-conviction relief.  The motion was granted.  City's Ex. 69.

On October 31, 1996, Bryson filed a Petition for a Writ of Mandamus with the OCCA directing the District Court judge to allow Bryson access to the forensic evidence for DNA testing.  City's Ex. 70.

On March 4, 1997, the OCCA affirmed the District Court's November 20, 1995 order denying post-conviction relief.  The court concluded that "at this juncture," petitioner had not established that he was entitled to post-conviction relief and the post-conviction appeal must fail.  The court stated "[b]ecause Petitioner's application is based upon the results of DNA testing, and the testing has yet to be accomplished, a post-conviction appeal is premature."  City's Ex. 70, p. 3.  In that same order, the OCCA granted petitioner's writ of mandamus.  The OCCA ordered the forensic evidence to be preserved in its present state as previously ordered by the District Court

and further stated: "This, however, does not prohibit testing by the Petitioner pursuant to an order of the District Court."  City's Ex. 70, p. 6.

On March 18, 1997, Gilchrist made an inventory of the forensic evidence. City's Ex. 71.  On March 28, 1997, the District Court directed Gilchrist to ship the forensic evidence to Brian Wraxall ("Wraxall"), SERI's chief forensic serologist.

The evidence was received by Wraxall on April 2, 1997.  City's Ex. 72.  In a report dated April 22, 1997, Wraxall concluded that the "semen on both vaginal swabs . . . could not have originated from David Bryson;" the "semen on the 'Q1' area from the robe . . . is consistent with the semen found on the vaginal swabs . . ." and "[t]he semen could not have originated from David Bryson;" and the "semen on the Q2 area from the robe . . . is different from the semen on Q1 . . . and the vaginal swabs . . ." and the "semen could not have originated from David Bryson."  City's Ex. 73, p. 5. (emphasis in original)[4]

On April 22, 1997, due to the statute of limitations imposed by the Antiterrorism and Effective Death Penalty Act of 1996, Bryson filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, CIV-97-622-C, to preserve other constitutional claims resulting from his trial and conviction in 1983.  City's Ex. 60, p. 9.  The case was later administratively closed by the court to allow exhaustion of state remedies.  Case No. CIV-97-622-C, doc. no. 17.

On May 5, 1997, Bryson filed another application for post-conviction relief in the District Court alleging that the DNA evidence was "newly discovered evidence" and the results exonerated him.  City's Ex. 60, p. 10.

---

[4] It appears Ms. Taylor died subsequent to the DNA testing.  *See*, plaintiff's response, doc. no. 124, p. 3, n. 4.

On May 9, 1997, Gilchrist had a conversation with Macy. She made handwritten notes of that conversation which states "@ this point, have no biological connection to Bryson." City's Ex. 74.

The prosecution was granted leave to perform another DNA analysis on the evidence in Bryson's case. The evidence was sent to LabCorp. On September 3, 1997, serologist Meghan Clement issued a report concluding that Bryson was excluded as the semen donor. Bryson's Ex. 77, p. 5-6; Bryson's Ex. 55.

On November 3, 1997, three hair slides were sent to LabCorp for DNA testing at the request of Assistant District Attorney Pattye High and analyzed. Gilchrist's Ex. 3, p. 440, ll. 16-19; City's Ex. 75, Ex. 76. LabCorp was unable to obtain a sufficient amount of DNA to obtain PCR analysis of the hair. City's Ex. 76.

On December 30, 1997, the District Court, without conducting an evidentiary hearing, denied Bryson's application for post-conviction relief, concluding that the DNA evidence would not have changed the verdict of Bryson's trial because of the overwhelming evidence of guilt. City's Ex. 77.

Bryson appealed the decision to the OCCA and on February 9, 1999, the OCCA entered an order remanding the application to the District Court for an evidentiary hearing.

An evidentiary hearing was held on March 18, 1999 and April 1, 1999. Gilchrist testified at the hearing on March 18th. Bryson's Ex. 72. She testified that when she did her testing in 1982 and when she testified in court, she determined that the donor of the semen on the robe was type B (Q1 and Q2) and that the donor of the semen on the vaginal swabs, both the cervix and the post fornix swabs, were a type B. *Id.* at p. 27, ll. 16-25, p. 28, l. 1. She also confirmed her testimony at trial that the person who committed the offense was a B secretor. *Id.*, p. 31, ll. 3-6. She also

testified that she was not able to exclude Bryson as a donor of the hairs.  *Id*. at p. 38, ll. 16-25, p. 39, ll. 1-3.  Testimony was also elicited that Ms. Taylor had sex at 6:15 a.m. the morning of the sexual assaults.  Ms. Gilchrist testified that if it was not known who the person was with whom she had sex at 6:15 a.m. that the person could not be excluded from the DNA analysis by Wraxall and LabCorp.  *Id*. at p. 37, ll. 9-25, p. 38, ll. 1-4.

On March 31, 1999, the District Court issued an order denying the application. City's Ex. 79.  The court found the evidence in the case, notwithstanding the DNA evidence, was overwhelming.  The court stated:

> . . . Brian Wraxall's opinion is that Petitioner was not the donor on the semen found on the evidence presented for testing and ***that if there is no other explanation as to the source of the semen, then this Petitioner should be excluded as the assailant.***  There is other explanation here, that is, an act of sexual intercourse by the victim on the same morning.
>
> . . . The evidence presented, coupled with a scientific explanation of the absence of Petitioner's semen and the presence of that of another, would have still led the jury at this Petitioner's trial in 1983 to conclude that Petitioner was guilty as charged.

*Id*., pp. 11-12.

Bryson appealed again.  On August 13, 1999, the OCCA reversed the District Court's order denying petitioner post-conviction relief.  The OCCA stated:

> . . . we do not agree [with the district court's] finding that there is "other explanation" of "an act of sexual intercourse by the victim on that same morning" as a basis for the denial of post-conviction relief.

. . . . As Petitioner asserts, "[t]he circumstances from the trial and post-conviction proceedings establish the 6:15 a.m. sex was with her fiancee."  There is nothing in the record to indicate any other sexual partner of the victim. And, DNA testing excludes the victim's fiancee from being a semen donor.

. . . we find the DNA evidence does, in fact create a reasonable probability of changing the outcome of this trial. DNA testing by two separate entities conclusively eliminates Petitioner, as well as the victim's fiancee.  The evidence supports Petitioner's argument that the rapist did ejaculate . . .

* * * *

Therefore, finding sufficient evidence of material facts that requires vacation of Petitioner's conviction in the interest of justice, we find it necessary to **REVERSE** the order of the District Court denying Petitioner post-conviction relief. Further, the Judgment and Sentence imposed against Petitioner in the District Court of Oklahoma County, Case No. CRF-82-5031, is hereby **VACATED** and **SET ASIDE** and Petitioner is hereby **GRANTED** a **NEW TRIAL**."

City's Ex. 80, pp. 5, 6 and 8 (emphasis in original).

Bond for defendant was set at $200,000 and after a writ of habeas corpus to the OCCA, the amount of the bond was reduced to $100,000.  On October 15 1999, Bryson was released from incarceration after posting the $100,000 bond.  Bryson's bond was later reduced to $40,000 by agreement of the parties.  Macy's Ex. 22, Macy's Ex. 25, p. 17.

D.    Bryson's Case Dismissed

On August 27, 1999, United States Senior District Judge Ralph G. Thompson issued a memorandum opinion in Mitchell v. Ward, 150 F.Supp.2d 1194 (W.D. Okla.

1999), rev'd in part, <u>Mitchell v. Gibson</u>, 262 F.3d 1036 (10th Cir. 2001), which was critical of Gilchrist's testimony and conduct. Judge Thompson found Gilchrist's trial testimony to be "without question, untrue" and to be "at least, misleading." 150 F.Supp.2d at 1226-1229. In the opinion, Judge Thompson noted that Gilchrist had been criticized in other opinions of the Oklahoma Court of Criminal Appeals for her testimony and conduct, <u>McCarty v. State</u>, 765 P.2d 1215, 1217-19 (Okla.Crim.App. 1988); <u>Fox v. State</u>, 779 P.2d 562, 571-72 (Okla. Crim.App. 1989); <u>Pierce v. State</u>, 786 P.2d 1255, 1261 (Okla.Crim.App. 1990); <u>Miller v. State</u>, 809 P.2d 1317, 1319-20 (Okla.Crim.App. 1991). *Id*. at 1229, n. 52. As a result of the opinion, Gilchrist's supervisor, Byron Boshell ("Boshell"), was asked to conduct an investigation on the impact of the court rulings on the forensic laboratory. Bryson's Ex. 13; Bryson's Ex. 14, p. 12, ll. 1-5.

Laura Schile ("Schile") and Elaine Taylor, OCPD forensic chemists, were asked by Boshell to conduct an examination of the hairs in Bryson's case. In their examination, they failed to find similarities between the crime scene hairs and those of Bryson. They made the recommendation that the Bryson hairs be thoroughly inspected by an outside analyst. Bryson's Ex. 52; Bryson's Ex. 41.

On August 30, 2000, Fisher inspected the forensic evidence and discovered some was missing. On September 19, 2000, he filed a motion for access to the remaining evidence for DNA testing. The Assistant District Attorney, Pattye High, advised Fisher that she had already told Gilchrist to send out the hair evidence. Gilchrist told Fisher she had not yet sent out the evidence because she had not received the message. On September 20, 2000, Fisher filed a request for an order to prevent DNA testing until a protocol could be established. This request was granted

on September 21, 2000. Complaint filed in CIV-04-662-F, pp. 31-33 and City's Ex. 53, pp. 18-19.

At the request of the FBI, Oklahoma City and the OCPD, Douglas W. Deedrick ("Deedrick"), FBI supervisory special agent, conducted a review of eight cases handled by Gilchrist spanning the period of 1982 to 1991. On April 4, 2001, Deedrick issued a report on his review. One of the cases he reviewed was the Bryson case. Bryson's Ex. 20. In the report, Deedrick stated:

> In this case, Gilchrist identifies a pubic hair like the suspect's known pubic hairs on the victim's skirt and three (3) head hairs like the suspect's known head hairs on/in items from the victim and scene.

> The pubic hair had been mailed to LabCorp of America in November, 1997 and a portion of the hair was removed for testing. The remaining portion was examined by SSA Deedrick in the OCPD laboratory. The hair consists of the distal portion of a body hair of undetermined racial origin. This hair does not exhibit the same microscopic characteristics as the known pubic hairs of the suspect or victim.

> The questioned head hairs identified with the suspect do not exhibit the same microscopic characteristics as the known head hairs from the suspect. It is noted that the known head hair samples from the victim and suspect are limited.

Bryson's Ex. 20, p. 5. Although he conducted a review of eight cases, only five of those cases had prepared glass microscope slides that could be reexamined by Deedrick. In regard to these cases, Deedrick stated:

> [A]ll five cases reviewed had either errors in identification or interpretation. Hairs that had been associated to suspects and/or victims were either too limited for meaningful comparison purposes or associated incorrectly. The

18

> incorrect associations could have been resolved if a
> confirmation policy existed, where another examiner would
> independently review the associations.

*Id.* at 20, p. 1.  Deedrick also criticized Gilchrist's trial testimony in the Bryson case,
wherein Gilchrist testified: "I would think it would be impossible not to be able to
distinguish hairs from two different individuals if that's what you're saying."
Deedrick stated that Gilchrist implies that the hairs are "'unique' to an individual, and
misrepresents the science of hair comparisons."  *Id.* at p. 5.

Prior to Deedrick's report, Macy was advised by Chief of Police M.T. Berry by
letter dated March 23, 2001 that the FBI had found that the hair evidence did not match
in the Bryson case.  City's Ex. 83.

On August 21, 2001, an Oklahoma City Departmental Review Board convened
to review evidence and facts concerning alleged violations by Gilchrist of Oklahoma
City Personnel and Oklahoma City Department policies.  The hearing lasted fourteen
days consisting of eight days of testimony and six days of Board deliberations.  On
September 21, 2001, the Board issued a report wherein, it recommended that Gilchrist
be terminated.  Bryson's Ex. 19.  The Board found in part that Gilchrist engaged in
casework analysis that was found to be flawed and improperly documented.  *Id.* at 15-
18.  This included the Bryson case.  The Board could find "little or no evidence that
Joyce Gilchrist is able to properly conduct hair analysis."  *Id.* at p. 17.

On September 25, 2001, Gilchrist was terminated in part because of her work
in Bryson's criminal case.  City's Ex. 84.

In March of 2002, an agreement was reached between Bryson's counsel and
Assistant District Attorney, Richard Wintory, for the DNA testing of the remaining
evidence, *i.e.* hair, bite swabbing, torn fingernail, pot pipe and hair root.  The evidence
was sent to Wraxall, who tested it in March 2003.  In a report dated March 6, 2003,

Wraxall determined that "[n]one of the evidence examined shows the presence of <u>any</u> DNA from David Bryson." City's Ex. 86, p. 8 (emphasis in original).

On May 16, 2003, Richard Wintory, on behalf of the State of Oklahoma, filed a Motion to Dismiss and Recall Warrant. The motion stated in part:

> "[E]vidence developed by and through the advanced technology of DNA testing, which was not available to investigating agencies at the time of charging the defendant and through his first criminal trial and subsequent state appeals, establishes conclusively that Bryson is excluded as the sperm contributor and further DNA testing of all biological evidence collected in this case has failed to generate results that either confirm or deny Bryson is the perpetrator of the crimes charged herein. Therefore, the State of Oklahoma moves for dismissal of the charges against David Johns Bryson and recall of the arrest warrant based on evidence developed through DNA technology which raises a doubt of the defendant's guilt which is reasonable.

City's Ex. 87, pp. 6-7.

On June 24, 2003, the District Court entered an order sustaining the motion and ordered the case "dismissed." In the order, the court stated that it had found no authority to dismiss the case with prejudice as requested by defendant. The court ordered the arrest warrant cancelled, withdrawn and recalled and ordered defendant's bond exonerated.

E. Gilchrist's January 23, 1983 Report Challenged

Wraxall concludes that the January 23, 1983 report by Gilchrist is incomplete and misleading. Bryson's Ex. 24. Initially, Wraxall found Katherine Kuritz to be a non secretor rather than a secretor as found by Gilchrist. He also found:

On 10-18-02 Ms. Gilchrist conducted the absorption inhibition test[5] on [the vaginal aspirate, swabs and rectal swab] and found that no secreted B antigen, consistent with Mr. Bryson, was found.  The notes indicate, however, that the positive control was not working correctly.  The test was repeated the next day and again the positive control was not working correctly.  These tests were not repeated even though a A/I test was conducted on 1-25-83 with correct positive controls.  Therefore, based on the results, no conclusion should be drawn regarding the ABO & secretor status of the semen donor.  However, assuming that the results on the evidence are correct, several inconsistencies in Ms. Gilchrist's interpretation are apparent:

> 1)     A review of Ms. Gilchrist's notes regarding the P30 assay reveals that there was a high level of semen on the Cervical Swab sufficient for a B blood type to have been detected, if it existed.  This strongly indicates that David Bryson was excluded as being a contributor of the semen found in the vagina of Theresa Taylor.

> 2)     While there is predominantly H antigen on the Cervical Swab, consistent with the victim, there are indications of A antigen on the Vaginal Aspirate and Rectal Swab.  The presence of A antigen is inconsistent with either Theresa Taylor or David Bryson.  In light of the presence of A antigen on the Pipe this should have been explored further.

> 3)     The absorption elution (A/E) test is more sensitive and is used for detecting small amounts of the ABO blood group substances which are found in non-secretors and also in dilute stains from secretors.  The absorption elution test is prone to false positive results due to "wash reactions."  Ms. Gilchrist's notes show only "+" and "-" scoring instead of the customary 1 to 4 scoring of agglutination intensity which she used in the absorption inhibition test.  Her absorption elution test results show weak positive results

---

[5]  The method for detecting the ABO blood group substances in body fluids.

for the B antigen on 3 of the 4 swabs and a "REPEAT" note
appears on the bottom of the page of her notes.  It does not
appear that a repeat test was conducted.  Even if the A/E
test was correct the combined results of the P30, A/I and
A/E on the Cervical Swab would indicate a B non-secretor
which would exclude Mr. Bryson.

There are 2 semen stains (labeled Q1 and Q2) on the Robe that are the
result of vaginal discharge.  The P30 assay on Q1 showed the same high
level of semen as found on the Cervical Swab and again gave test results
by A/I of only H antigen but no B antigen.  Stain Q2 however contained
a lower level of semen by P30 assay but by A-1 gave test results of clear
B and H antigens.  This is strong evidence that there are probably 2
semen donors on the Robe.  Again if Katherine Kuritz, the owner of the
robe, is in fact a non-secretor, then she could not be a contributor to the
Q1 semen stain.  That would mean that stain Q1 came from Ms. Taylor
and based on the P30 and A/I results, Mr. Bryson is excluded.  The B
antigen obtained by the A/E could have come from the background of
the robe and therefore from Thomas Kuritz.  Ms. Gilchrist failed to run
a substrate or background control from the robe as she was taught in my
laboratory at Serological Research Institute in California.

Wraxall then concluded:

Ms. Gilchrist's conclusions as stated in her report of 1-28-[8]3 are badly
written at best but in fact are totally misleading as follows:

1)     The results from the vaginal aspirate, vaginal and rectal swabs
together with both stains from the robe are combined by Ms. Gilchrist to
conclude that the semen donor on all items is a B Secretor "and the
semen could have originated from Bryson."  Of all the items and stains
only one could be from a B Secretor (i.e. Q2 on the Robe) and that
semen could have originated from Thomas Kuritz.  That fact does not get
reported until 2 paragraphs later and then in a discussion about PGM.

2)     No mention is made of the different A/I results between the 2
stains on the robe.  They are lumped together as "semen stains."

3)    Statements are made on 2 occasions in the conclusions that all four individuals (ie Ms. Taylor, Mr. Bryson and Mr. & Mrs. Kuritz) are all the same PGM type (2-1) and "therefore no conclusion as to the PGM type of the semen donor can be drawn."  This is wrong for 3 reasons:

a)    The PGM types are all type 1, not 2-1, as the photograph of the results clearly shows.

b)    The conclusion gives the impression that a PGM result was obtained when it was not, and

c)    If a PGM test is completed on the evidence items and a type other than that of the four individuals is obtained, then Mr. Bryson would be excluded as the semen donor.  It is a totally false premise that in sexual assault cases, conducting PGM tests where the victim and suspect are the same type will not give usable results.  This presumes that the suspect is the semen donor.

In addition, Wraxall concludes that Gilchrist "should have seen that Mr. Bryson was excluded as the semen donor on the Cervical Swab and on the Q1 stain on the Robe." Bryson's Ex. 24.

Laura Schile[6] concludes that "[n]one of the purported pubic hairs from the crime scene and/or from the victim and her clothing have the prominent characteristics of David Bryson's pubic hair."  Bryson's Ex. 52.  Schile also concludes:

. . . Joyce Gilchrist, with even minimal competence, would have been able to determine in 1983 that David Bryson could be excluded as the source of the hairs obtained from the crime scene and from the victim.

---

[6]  Schile, a former OCPD forensic chemist, is currently employed as the Chief of Forensic Services for the Oklahoma Indigent Defense System and has a private forensic consulting firm based in Tulsa, Oklahoma.  Bryson's Ex. 52.

> . . . It would be obvious to any competent hair analyst –
> and for that matter to most or all lay persons – that David
> Bryson's pubic hairs are markedly different from the hairs
> collected in Bryson's case and identified as pubic hair from
> the crime scene and/or the victim.

*Id*.

F.   Gilchrist's Training and Supervision

In May, 1980, Gilchrist received a Bachelor of Science degree from Central State University in Edmond, Oklahoma.   Gilchrist's major was forensic science. City's Ex. 1.  Gilchrist's official transcript shows a checkered academic career (which commenced in 1966) and a dismal academic record.  *Id*.

From February through May of 1980,  Gilchrist interned in the Oklahoma City Police Department forensic laboratory as a degree requirement.  Gilchrist's Ex. 1, p. 6, ll.1-25, p. 7, 1-2, p. 8, ll. 13-17; City's Ex. 2.  Gilchrist worked with and received training from Janice Davis.  Gilchrist's Ex. 1, p. 9, ll. 15-25, p. 10, ll. 1-2.  On July 1, 1980, Gilchrist was employed by the City of Oklahoma City as a forensic chemist and assigned to the forensic laboratory.  City's Ex. 2.  Gilchrist was assigned her first case on or about August 4, 1980.  City's Notice to the Court and Plaintiff (doc. no. 142).[7]

---

[7]  Gilchrist testified in deposition that she was given her first case in mid or late 1981 and that her training period ended in the fall of 1981.  Gilchrist's Ex. 1, p. 29, ll. 24-25; p. 30, ll. 1-6. After the filing of the summary judgment briefs, the City notified the court and plaintiff that it had been advised of the existence of an assignment log of forensic cases.  *See*, Notice to the Court and the Plaintiff (doc. no. 142).  From a review of the log, it appeared to the City that the first case assigned to Gilchrist was on or about August 4, 1980.  The earliest lab report found by Gilchrist was completed on September 22, 1980.  The City could not state whether Gilchrist worked with another chemist on the case. *Id.*  The court appreciates the candor of the City and viewing the facts in a light most favorable to plaintiff finds that Gilchrist was assigned her first case in August 4, 1980 rather than in mid or late 1981 and her on-the-job training ended at that time.

From August 4 through August 22 of 1980, Gilchrist attended the Blood Stain Analysis System Course given by the Serological Research Institute ("SERI"), in Emeryville, California. City's Ex. 5. From January 11 through January 23, 1981, Gilchrist attended the Basic Forensic Serology School given by the Federal Bureau of Investigation ("FBI") at the FBI Academy in Quantico, Virginia. She attended the Introduction to Hairs and Fibers School at the FBI Academy from January 25, 1981 to February 6, 1981. During this course, Gilchrist was provided a 131-page manual entitled Technical and Legal Aspects of Forensic Serology: A Laboratory Manual. At the end of February 1981, Gilchrist returned to SERI to attend a Semen Analysis Course. This course lasted four days. *Id.*

In the 1980's, many, if not most forensic laboratories, had training programs for serology and hair/fiber examiners that were typically one to two years in duration. Bryson's Ex. 1, p. 18. The FBI hair course is an introductory course to allow one to proceed with on-the-job training to become fully qualified. This course does not fully qualify a scientist to work independently in hair analysis. Bryson's Ex. 57, p. 7.

After Gilchrist was terminated, her office was inventoried. A pamphlet, a booklet and a training outline were found in the office which advised witnesses to tell the truth when providing courtroom testimony. City's Exs. 13, 14 and 15. A January 1977 manual by the FBI entitled Microscopy of Hair was also found. City's Ex. 12.

The OCPD forensic laboratory was commanded by commissioned police officers. Gilchrist's Ex. 1, p. 32, ll. 21-24. These police officers did not have a scientific background or experience in forensic science. *Id.* at p. 33, 6-16. None of Gilchrist's supervisors were qualified to know whether she conducted her tests correctly. *Id.* at p. 34, ll. 10-15.

Richard DeLaughter ("DeLaughter"), a captain with the OCPD, supervised the forensic laboratory during 1982 and 1983, the period of the Bryson case. Bryson's Ex. 5, p. 9, ll. 3-14, p. 12, ll. 2-11, p. 13, ll. 1-2. Mr. DeLaughter "had a couple of people in the lab that [he] depended on quite a bit for . . . keeping [him] informed on what was going on in the lab or in the system." Those individuals were Janice Davis and Janie Bates. "[T]hey kind of ran things." *Id*. at p. 9, ll. 15-24. He relied upon them to "develop procedures and policies, to do whatever is necessary to operate a forensic laboratory." *Id*. at p. 10. "They created policy that created peer review. So that cases could be cross-checked when done." *Id*. at p. 11, ll. 21-22. Delaughter, however, did not ever view a peer review. He relied upon Janice Davis and Janie Bates' word that peer review was being conducted. *Id*. at p. 17, ll. 9-21. After Gilchrist's training, none of her cases were reviewed by Janice Davis or anyone else. Gilchrist's Ex. 1, p. 28, ll. 16-18.

DeLaughter gave annual performance evaluations for Gilchrist in 1982 and 1983. Bryson's Ex. 5, p. 24, ll. 15-25; p. 25. ll. 1-6; p. 27, ll. 16-19, p. 39, ll. 8-11. Although DeLaughter rated her "fully competent" on most skills evaluated, he did not independently verify or analyze the skills that were evaluated. *Id.* at p. 30, l. 25; p. 31, ll. 1-3; p. 32, ll. 8-11; p. 40, ll. 16-19.

DeLaughter did not have a policy of attending trials to hear the testimony of the forensic chemists to make sure they were testifying truthfully or credibly. Bryson's Ex. 5, p. 23, ll. 11-15. He could not recall ever sitting through the testimony of Gilchrist. *Id*. at ll. 16-18.

There was no lab policy and procedure manual for the forensic laboratory in 1982. Ex. 70, p. 25, ll. 13-23.

G.     Additional Involvement of Robert Macy

Macy started his career as District Attorney in June 1980.  Bryson's Ex. 44, p. 6, ll. 13-15; p. 34, l. 23.  It ended in March 2001.  *Id.* at ll. 16-18.

Prior to 1986, Macy did not have a policy about informing the defense of forensic evidence that could be useful to the defense.  Bryson's Ex. 44, p. 46, ll. 22-25; p. 47, ll. 3-4.  The formal training provided to Assistant District Attorneys for Oklahoma County did not include the fair and proper use of forensic evidence. Bryson's Ex. 50, p. 9, ll. 14-17; p. 11, ll. 19-25.  There was no in-house training regarding the use of forensic evidence.  Bryson's Ex. 50, p. 14, ll. 12-25, p. 15, ll. 16. The training should have included the use of and evaluation of forensic evidence and the use and preparation of expert witnesses.  Bryson's Ex. 42.

The prosecutors in Macy's office had no formal, established standards regarding the use and application of their prosecutorial powers, including the requirement that they provide, without request, all material which might tend to exonerate a defendant or lead to a lesser punishment.  Bryson's Ex. 42.

From mid-1970 until mid-1980's, Janie Bates worked for the OCPD forensic laboratory and during much of that time was a senior forensic chemist.  According to Ms. Bates, who had duties regarding the budget,  the District Attorney's office funded a position in the OCPD forensic laboratory.  To the best of her recollection, that position was filled by Gilchrist.  Ms. Bates is not sure of the exact dates the position was funded but it would have been during the 1980's.  Bryson's Ex. 83.

During his deposition, Macy testified:

Q.  (By Mr. Barrett [plaintiff's counsel])  Mr. Macy, there's been testimony in this case that your office paid for a part of the operation of the Oklahoma City Police Department forensic laboratory.  Assuming that to be true, do you believe that would carry with it an obligation to make sure that money would be well spent?

A.  I recall seeing somewhere since this lawsuit has been involved some kind of written agreement between the Oklahoma City Police Department and I assume it was my office, but –

Q.  You would not want to make that expenditure unless you considered that money to be well spent, would you?

A.  That's right.

\* \* \* \*

Q.  I certainly don't want to stop you from making an answer, but, Mr. Macy, do you believe that spending that money on the laboratory would carry with it an obligation to make sure that that money was well spent?

\* \* \* \*

A.  There would be a responsibility to see to it the money was well spent.

Q.  And to assure the money was well spent, did you undertake any investigations of the quality of their scientific work apart from what you observed in the courtrooms?

\* \* \* \*

A.  I don't know of any independent review of the work.

Bryson's Ex. 44, Volume IV, p. 228, 1-25, p. 229, ll. 1-10.

On January 17, 1987, a forensic chemist, John Wilson, filed a complaint with a forensic association, Southwestern Association of Forensic Scientists, of which he and Gilchrist were members.  City's Ex. 43.  This complaint involved Gilchrist's actions and testimony in several cases.  He had initially become aware of "a serious situation existing in the forensic community" in 1985.  *Id.*  On November 9, 1987, Gilchrist was sent the association's findings, which stated: "The Board of Directors of this Association has concluded that while a violation of the letter of our Code of Ethics has occurred, this is not a violation of the spirit of our Code, and was made without malice or intent.  We therefore do not recommend expulsion of Ms. Gilchrist; neither do we censure nor discipline her."  City's Ex. 44.  Walt Wilhelm, OCPD

28

Deputy Chief, advised Police Chief, Robert Wilder, about the decision and they consulted with Macy.  Bryson's Ex. 75, p. 20, ll. 18-20.  Macy convinced Wilhelm that Gilchrist was acting within professional boundaries.  *Id*. at p. 24, 5-7.  Macy had a lot of sway regarding Gilchrist by virtue of his position.  *Id.* at p. 24, ll. 23-25.  Macy publicly defended Gilchrist concerning the criticism.  He said that she was "'one (chemist) who is willing to give an opinion (about test results).'"  He also said that "[part of] the problem I've had with forensic experts is that they're too cautious."  Bryson's Ex. 84, second Tulsa Tribune article.

After the OCCA granted Bryson post-conviction relief, Macy stated in a television interview that he intended to try Bryson and convict him on the same evidence.  City's Ex. 94.

IV.   Discussion

    A.   Statute of Limitations

In their papers, the City and Macy contend that plaintiff's § 1983 claims for malicious prosecution and bad faith denial of post-conviction access to potentially exculpatory evidence are time-barred.  The statute of limitations for a § 1983 claim is the same as the statute of limitations for a personal injury action in the state in which the claim arose.  Wallace v. Kato, 549 U.S. 384, 387 (2007).  In Oklahoma, the limitations period for a personal injury action is two years.  12 O.S. § 95(A)(3).  Although state law provides the statute of limitations to be applied, federal law governs when the limitations period begins to run.  Wallace, 549 U.S. at 388.  Accrual of a § 1983 claim occurs when the plaintiff has a complete and present cause of action, that is, where the plaintiff can file and obtain relief.  *Id*. at 389.

The parties also challenged the timeliness of the § 1983 claims at the motion to dismiss stage, which the court rejected.  Citing  Heck v. Humphrey, 512 U.S. 477

(1994), the court concluded that the claims did not accrue until the charges against Bryson were dismissed on June 24, 2003, because success on both claims, as pled by plaintiff, would have necessarily implied that his conviction was wrongful.[8]  The original action was filed within the two-year limitations period.  Although the original action was dismissed without prejudice and the present action was not filed until after the two-year statute of limitations period had expired, the court concluded that by

---

[8]  In <u>Heck</u>, a state prisoner filed suit under § 1983 raising claims which, if true, would have established the invalidity of his outstanding criminal conviction. The Supreme Court stated:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983."

*Id*. at 486-487 (footnote omitted).

The Court rested this conclusion upon "the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments." *Id.* at 486. The Court stated that Congress "has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, and that specific determination must override the general terms of § 1983.'" *Id*. at 482 (quoting <u>Preiser v. Rodriguez</u>, 411 U.S. 475, 490, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)).

Thus, under <u>Heck</u>, "[A] § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." *Id.* at 489-90.

Furthermore, the Tenth Circuit, in <u>Beck v. City of Muskogee Police Dep't</u>, 195 F.3d 553, 557 (10th Cir. 1999), found that "<u>Heck</u> precludes § 1983 claims relating to pending charges when a judgment in favor of the plaintiff would necessarily imply the invalidity of any conviction or sentence that might result from prosecution of the pending charges.  Such claims arise at the time the charges are dismissed."

operation of Oklahoma savings statute, 12 O.S. 2001 § 100,[9] plaintiff's claims were timely filed.

In the present motions, the City and Macy assert that the limitations period for the malicious prosecution claim commenced on August 13, 1999 when Bryson's conviction was reversed.  They contend that, as of August 13, 1999, there was no outstanding criminal judgment and that <u>Heck</u> consequently would not apply.  They maintain the Tenth Circuit, in <u>Smith v. Gonzales</u>, 222 F.3d 1220 (10th Cir. 2000), concluded that the statute of limitations on a plaintiff's "wrongful conviction" claim began when the plaintiff's conviction was reversed despite the existence of renewed prosecution on those charges.  Furthermore, the City argues that although charges were still pending against Bryson after August 13, 1999, the Supreme Court concluded in <u>Wallace v. Kato</u> that <u>Heck</u> would not apply to a § 1983 claim brought before a conviction, i.e., to pending charges.[10]

---

[9]  In <u>Brown v. Hartshorne Pub. Sch. Dist. #1</u>, 926 F.2d 959, 962 (10th Cir. 1991), the Tenth Circuit concluded that Oklahoma's savings provision applies to a § 1983 claim.

[10]  In <u>Wallace</u>, the petitioner contended that <u>Heck</u> compelled a conclusion that his false arrest suit could not accrue until the state dropped the charges against him.  Rejecting that argument, the Supreme Court stated:

> [T]he <u>Heck</u> rule for deferred accrual is called into play only when there exists "a conviction or sentence that has not been . . . invalidated," that is to say, an "outstanding criminal judgment."  It delays what would otherwise be the accrual date of a tort action until the setting aside *of an extant conviction* which success in that tort action would impugn.  We assume that, for purposes of the present tort action, the <u>Heck</u> principle would be applied not to the date of accrual but to the date on which the statute of limitations began to run, that is, the date petitioner became held pursuant to legal process.  Even at that later time, there was in existence no criminal conviction that the cause of action would impugn; indeed, there may not even have been an indictment.
>
> What petitioner seeks, in other words, is the adoption of a principle

31

The court, upon further consideration, again determines that Bryson's malicious prosecution claim is timely.  The court, however, reaches this determination for a different reason.  As stated by the Supreme Court in <u>Wallace v. Kato</u>, accrual of a § 1983 claim occurs when the plaintiff has a complete and present action.  In other words, the claim accrues when the plaintiff can file and obtain relief.  *Id*. at 389.  According to the Tenth Circuit, "a due process claim for malicious prosecution arises only once 'the original action,' whatever form it has taken, has 'been terminated in favor of plaintiff.'"  <u>Mondragon v. Thompson</u>, 519 F.3d 1078, 1083 (10th Cir. 2008).  Therefore, "[b]ecause the statute of limitations does not start running before the elements of a claim are satisfied, the statute of limitations for [the due process claim

---

that goes well beyond <u>Heck</u>: that an action which would impugn an anticipated future conviction cannot be brought until that conviction occurs and is set aside.  The impracticality of such a rule should be obvious.  In an action for false arrest it would require the plaintiff (and if he brings suit promptly, the court) to speculate about whether a prosecution will be brought, whether it will result in conviction, and whether the pending civil action will impugn that verdict, - all this at a time when it can hardly be known what evidence the prosecution has in its possession.  And what if the plaintiff (or the court) guesses wrong, and the anticipated future conviction never occurs, because of acquittal or dismissal?  Does that event (instead of the <u>Heck</u>-required setting aside of the extant conviction) trigger accrual of the cause of action?  Or what if prosecution never occurs-what will the trigger be then?

We are not disposed to embrace this bizarre extension of <u>Heck</u>.  If a plaintiff files a false arrest claim before he has been convicted (or files any other claim related to rulings that will likely be made in a pending or anticipated criminal trial), it is within the power of the district court, and in accord with common practice, to stay the civil action until the criminal case or the likelihood of a criminal case is ended.

<u>Wallace</u>, 549 U.S. at 393-394.

for malicious prosecution] cannot start until the plaintiff has achieved a favorable result in the original action." *Id.*

In the case at bar, the original action did not terminate in favor of plaintiff until June 24, 2003. Until that date, plaintiff could not sue for malicious prosecution under § 1983 and obtain relief. Although the original conviction was vacated and set aside on August 13, 1999, a new trial was granted and the original action continued. No new charging paper was filed. All pleadings were filed in the original action, CRF-82-5031. Indeed, the dismissal order was filed in CRF-82-5031.[11] The court therefore concludes that plaintiff's § 1983 malicious prosecution claim did not accrue until the original action was terminated in favor of plaintiff with the dismissal of the action on June 24, 2003.

Because the court concludes that the § 1983 malicious prosecution claim accrued on June 24, 2003, the court concludes that the claim is timely under the applicable two-year statute of limitations and the savings provision.

The court now turns to the challenge as to the timeliness of plaintiff's claim of bad faith denial of post-conviction access to potentially exculpatory evidence. In its papers, the City has proposed various accrual dates for the claim: (1) 1988, when Gilchrist advised Pearson that the forensic evidence was destroyed; (2) 1990, when the evidence was found, examined and reported by Cannon to be in existence; and (3) 1997, when the evidence was subjected to DNA testing. The City contends that with

---

[11] In its reply, the City argues that Bryson's challenge to his continued prosecution after the reversal of the conviction, based upon Gilchrist's alleged fraudulent acts, was not alleged in the complaint. The City contends that none of the defendants had any notice that Bryson would change his theory of liability that the continued prosecution was also caused by Gilchrist's alleged fraudulent acts. The court, however, concludes that Bryson's malicious prosecution claim encompasses the entire prosecution. The court, as discussed hereinafter, concludes that there is evidence, viewed in a light most favorable to plaintiff, that Gilchrist's alleged fraudulent acts was a cause of the continued prosecution.

any of these proposed dates, the applicable two-year statute of limitations has long since expired.  If the accrual date was deferred under Heck, the City also proposes that the accrual date commenced on August 13, 1999, when the conviction was vacated and set aside by OCCA.  At that point, according to the City, there was no conviction to be impugned by a § 1983 action and Heck does not apply to pending charges as concluded by the Supreme Court in Wallace.

In his response, Bryson does not address the timeliness of the plaintiff's claim of bad faith denial of post-conviction access to potentially exculpatory evidence.  He addresses only the timeliness of the malicious prosecution claim.  The court, in its discretion, deems the statute of limitations issue confessed pursuant to LCvR 7.1 (g).  Although the issue is confessed, the court has again considered the timeliness of the claim.  The court, upon further consideration, concludes that the claim is time-barred.  Even if Heck deferred the accrual of the claim while Bryson's conviction was outstanding, the court concludes that upon vacation of the conviction, Bryson could proceed with his § 1983 claim.  At that point, Bryson not only had access to the evidence previously denied but also was able to use that evidence in the retrial of the charges against him.  A § 1983 claim by Bryson seeking damages for the bad faith denial of post-conviction access to potentially exculpatory evidence would not have necessarily implied the invalidity of any conviction, past or anticipated.[12]  The court therefore concludes that the limitations period applicable to plaintiff's claim of bad faith denial of post-conviction access to potentially exculpatory evidence would have

---

[12] In light of the court's ruling, the court need not decide whether Wallace has overruled the Tenth Circuit's decision in Beck that Heck applies to pending charges.  The court, however, notes that the Tenth Circuit has continued to rely upon the Beck decision despite the existence of Wallace.  Williams v. Webor Morgan Strike Force, 2009 WL 500666 (10th Cir. March 2, 2009); Carson v. Tulsa Police Dept., 266 Fed. Appx. 763, 766 (10th Cir. February 21, 2008); Meadows v. Whetsel, 227 Fed.Appx. 769, 772 (10th Cir. May 22, 2007).

expired in 2001.  Because plaintiff's original action was not filed until 2004, the court concludes that the claim is time-barred.

Although the City and Macy challenged the timeliness of plaintiff's claim of bad faith denial of post-conviction access to potentially exculpatory evidence, Gilchrist has not.  At the motion to dismiss stage, Gilchrist also failed to challenge the timeliness of the claim.  *See*, doc. no. 47, p. 15, n. 4.  Gilchrist's answer does not affirmatively set forth a statute of limitations defense.  *See*, doc. no. 55, pp. 10-11. The court therefore concludes that this claim remains viable as to Gilchrist.  Gilchrist has challenged the merits of the claim in her summary judgment papers.  Those matters will be addressed below.

B.     Claim Against Gilchrist for Malicious Prosecution Under § 1983

Gilchrist contends that she is entitled to summary judgment on plaintiff's § 1983 claim for malicious prosecution because she is shielded from liability under the doctrines of absolute and qualified immunity.  Gilchrist contends that she is absolutely immune from liability for her trial testimony.  In addition, she asserts that she is entitled to qualified immunity for her non-testimonial conduct because plaintiff cannot show a constitutional violation.  According to Gilchrist, plaintiff cannot establish an absence of probable cause for his continued confinement or that she acted with malice, both essential elements of a malicious prosecution claim under § 1983.

Initially, the court need not address Gilchrist's absolute immunity argument. Plaintiff, in response, represents that he does not seek damages against Gilchrist for her trial testimony.  He only seeks damages for her conduct out of court.  Plaintiff may seek admission of the trial testimony to illuminate her out-of- court activities, but that it is an issue to be addressed in a motion in limine or at trial.

When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established. Martinez v. Beggs, ___ F.3d ___, 2009 WL 1058058 *4 (10th Cir. April 21, 2009). The court has the discretion to determine "'which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" Id. (quoting Pearson v. Callahan, 129 S.Ct. 808, 818 (2009)). In this case, because the court has previously determined at the motion to dismiss stage that the "unconstitutionality of Gilchrist's alleged actions was apparent in 1982," see, doc. no. 47, p. 8, and the court's view has not changed, the court need not again address whether the constitutional right at issue was clearly established. The court therefore addresses whether plaintiff has presented facts sufficient to show that a constitutional violation occurred.

Gilchrist is correct that an essential element of the constitutional tort of malicious prosecution under § 1983 is the absence of probable cause to support plaintiff's prosecution or continued confinement. Pierce v. Gilchrist, 359 F.3d 1279, 1294 (10th Cir. 2004). The mere fact that DNA evidence conclusively exonerated plaintiff is insufficient to support the malicious prosecution claim. Id. Plaintiff bears the "heavy burden of showing that Ms. Gilchrist's falsification of inculpatory evidence or suppression of exculpatory evidence was necessary to a finding of probable cause." Id. at 1295.

In determining the existence of probable cause, the false information proffered must be set aside and the exculpatory evidence omitted must be included. Pierce, 359 F.3d at 1293, 1295. Applying these principles, the court concludes that the evidence

of exculpatory facts presented by plaintiff[13] vitiates probable cause for the prosecution or continued confinement.[14]   Although the victim and a witness identified Bryson and Bryson had an injury to his penis, the court, as a matter of law, finds that the evidence would not be sufficient to support a finding of probable cause when considered with the forensic evidence that clearly excludes Bryson as the rapist.   The court recognizes that after the DNA testing in 1997 was revealed, two Oklahoma County District Court

---

[13]   Gilchrist argues that the only evidence plaintiff has to support its characterizations that Gilchrist's January 23, 1983 report was "false, fraudulent, falsified and fabricated" are the reports of plaintiff's experts and that their opinions are not evidence sufficient to overcome summary judgment.   The court initially notes that Gilchrist has not challenged any of plaintiff's experts under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993).   While expert opinion may not be rejected it is conclusory, see, Matthiesen v. Banc One Mortgage Corp., 173 F.3d 1242, 1247 (10th Cir. 1999), the court finds that none of the expert opinions relied upon by plaintiff are conclusory.   Although Gilchrist argues that none of the experts refer to Gilchrist's report as false, fraudulent, falsified or fabricated, the reasonable inference drawn from the experts' findings and opinions is that Gilchrist's conclusions in her report were false.   Another reasonable inference from the opinions is that Gilchrist withheld exculpatory evidence.

[14]   The City asserts in its papers that any claim regarding Gilchrist's analysis regarding the serological evidence has been waived because it was not raised in the original complaint filed in Case No. CIV-04-662-F.   The court disagrees.   The original complaint alleges that Bryson "voluntarily gave blood and saliva samples;" "Gilchrist also determined after testing on the semen and sperm samples obtained during the rape exam from Taylor's body and from a robe she wore after the rape, that the rapist was ABO type B and Bryson was ABO type B;" Gilchrist concluded "from these tests, Bryson was not excluded as the rapist;" Gilchrist failed to "conduct electrophoresis testing before trial;" and "Bryson does not at this time have sufficient information to allege that probable cause was lacking for his arrest or prosecution . . . " "Plaintiff may ask for leave to amend this complaint."   City's Ex. 54, ¶¶ 24, 25.   The court concludes that plaintiff put defendants on notice of the operative events and factual setting underlying a malicious prosecution claim which includes the serology evidence.   Although the complaint in this case does not challenge Gilchrist's analysis of the serology evidence, discovery in this case has revealed that Gilchrist's conclusions in her January 23, 1983 report were totally misleading and that Bryson was excluded as the semen donor on the cervical swab and Q1 stain on the robe.   Bryson's Ex. 62.   Defendants have been apprised of this discovery since the end of 2008 and the court concludes that defendants are not unduly prejudiced by allowing the malicious prosecution claim to proceed also on the basis of Gilchrist's analysis of the serology evidence.   The court grants plaintiff leave under Fed. R. Civ. P. 15(a) to include the evidence as a basis of his malicious prosecution claim in the pretrial report to be filed in this case.

judges denied Bryson post-conviction relief.  However, the District Court, in reaching its decisions, relied upon another explanation presented by the state for the source of the semen, that is, Ms. Taylor had an act of sexual intercourse on the morning of the rape.  The record did not support this explanation because the evidence revealed the rapist had ejaculated and there was no evidence to indicate any other sexual partner other than Ms. Taylor's fiancé, who had also been excluded by the DNA testing.  The court therefore does not find that the denial of post-conviction relief by the Oklahoma County District Court is sufficient to establish as a matter of law existence of probable cause.[15]

Gilchrist also argues that her January 23, 1983 report was not the basis for the continued prosecution after 1999 because the 1997 DNA testing had revealed that the semen could not have originated from Bryson.  The City, in its papers, also points out that Gilchrist had revealed to Macy during a conversation in May of 1999 that there was no biological connection to Bryson and that in April of 2001, the FBI found Gilchrist's hair analysis to be flawed.  Nonetheless, despite these revelations, the District Attorney's office continued to proceed with the prosecution of Bryson.  The court, however, concludes that there is evidence viewed in a light most favorable to

---

[15]  The City also argues that the judicial determination of probable cause at the preliminary hearing requires a finding that probable cause existed citing Taylor v. Meacham, 82 F.3d 1556 (10th Cir. 1996) and Hubbert v. City of Moore, 923 F.2d 769, 773 (10th Cir. 1991).  The court disagrees.  In Pierce, the Tenth Circuit stated: "The district court, [] held that '[e]ven when probable cause is present at the time of the arrest, evidence could later surface which would eliminate that probable cause.'  Op. 8.  We agree . . . ."  Pierce v. Gilchrist, 359 F.2d at 1295.  The Circuit also stated: "*If police officers have been instrumental in plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to decisions of prosecutors or grand jurors, or magistrates to confine or prosecute him.  They cannot hide behind the officials whom they have defrauded.*"  Id. at 1292. (emphasis in original).  There is evidence in the record that both the hair and serological evidence independently could have excluded plaintiff as a suspect.  There is also evidence that Barry Albert, the prosecutor at Bryson's trial, testified at the evidentiary hearing in March 1999 that prosecutions had been declined on many cases as far back as 1982 where there were inconsistencies in the ABO blood typing.  Macy's Ex. 20, pp. 7-8.

plaintiff to indicate that Gilchrist's report was a cause for Bryson's continued prosecution. Gilchrist testified as to her serology testing in the March 1999 evidentiary hearing, notwithstanding the 1997 DNA test results. There is also evidence in the record that Macy had stated in a television interview after the OCCA order granting post-conviction relief that he intended to try Bryson and convict him on the same evidence. City Ex. 94. Also, despite the FBI's 2001 report on the hair evidence, the evidence shows that hair evidence was sent in 2002 for DNA testing. After the hair evidence as well as the other evidence tested was found to have no connection to Bryson, the case against Bryson was finally dismissed. The court concludes, viewing the evidence and reasonable inferences drawn from the evidence in a light most favorable to plaintiff, that Gilchrist's report was a basis for continued prosecution of Bryson.

Another essential element of the constitutional tort of malicious prosecution claim is that defendant acted with malice. The court disagrees with Gilchrist that evidence of malice does not exist. The court concludes that a reasonable jury, based upon the evidence in the record viewed in a light favorable to plaintiff, could conclude that Gilchrist acted with malice.

In sum, the court concludes that Gilchrist is not entitled to qualified immunity on the § 1983 claim for malicious prosecution. The court finds that summary judgment on this claim should be denied.

C.    Claim Against Gilchrist for Bad Faith Denial of Post-Conviction Access to Potentially Exculpatory Evidence for DNA Testing Under § 1983

Gilchrist contends that she is entitled to summary judgment on plaintiff's § 1983 claim for bad faith denial of post-conviction access to potentially exculpatory evidence for DNA testing because she is shielded from liability under the doctrine of

qualified immunity. According to Gilchrist, she is entitled to qualified immunity for her post-conviction conduct because plaintiff cannot show a violation of his due process rights. She also asserts that she did not violate a clearly established law in effect at the time of the alleged violation.

In this case, the court has previously determined at the motion to dismiss stage that "defendant Gilchrist had fair warning, in light of pre-existing Supreme Court precedent, that the due process right at issue here existed in 1988 and thereafter and that her alleged violation of that right was unconstitutional." *See*, doc. no. 47, p. 12. The court's view has not changed and the court therefore does not again address whether the constitutional right at issue was clearly established. The court therefore addresses whether plaintiff has presented sufficient facts to show that a constitutional violation occurred.

Gilchrist asserts that plaintiff cannot show a constitutional violation because (i) she destroyed evidence in her possession due to a standard operating procedure and (ii) at the time of the destruction of that evidence, the exculpatory value of the evidence was not apparent and Bryson was able to obtain the evidence by other reasonably available means.

Plaintiff's claim, however, is not based upon the evidence that Gilchrist maintains that she destroyed.[16] *See*, plaintiff's response, doc. no. 122, p. 21 (Gilchrist's admission for summary judgment purposes is a "[non sequitur] in this case because the rape kit and other evidence were examined."). Plaintiff's claim is based upon the denial of access to evidence that was eventually found by Cannon and DNA tested. Pearson testified that he told Gilchrist that he "wanted everything that could

---

[16] Although Gilchrist does not identify in her briefing what evidence was purportedly destroyed, Gilchrist's deposition testimony reveals that it was extracts made from evidence that was collected either from the victim and/or the crime scene. Gilchrist's Ex. 2, p. 336, ll. 4-7.

be sent for DNA testing." Bryson's Ex. 86, p. 140, l. 25, p. 141, l. 1. She responded that "it had been destroyed." *Id*. at p. 141, ll. 2-3. Viewing the evidence and drawing reasonable inferences in a light most favorable to plaintiff, the court concludes that a reasonable jury could conclude that Gilchrist's statement to Pearson was referring to more than the evidence she had had "in her possession." And the forensic evidence, that was in fact in existence and ultimately found, was not destroyed. Viewing the evidence in a light most favorable to plaintiff that Gilchrist falsified her original forensic report and withheld exculpatory evidence from Bryson, that Gilchrist had later told Bryson's counsel (in 1996) that the evidence was on her windowsill to be destroyed and that she consulted the Assistant District Attorney after having been asked to preserve it and was told to ignore the request to preserve it, *see* Bryson's Ex. 87, p. 7, ll. 7-14; City's Exs. 61 and 62, the court concludes, although it is a close question, that plaintiff has presented sufficient evidence to avoid summary judgment as to whether Gilchrist violated his due process rights.

Gilchrist contends that there are extraordinary circumstances in this case that justify qualified immunity. She contends that she relied upon counsel, Assistant District Attorney, Sandy Stensaas, to ignore Bryson's counsel's request to preserve the evidence. The court finds that extraordinary circumstances do not exist to shield Gilchrist from liability under the doctrine of qualified immunity. Although Gilchrist consulted Ms. Stensaas in 1996, she did not consult her in 1988 when she originally informed Bryson's trial counsel that the forensic evidence had been destroyed.

In sum, the court concludes that Gilchrist is not entitled to qualified immunity on plaintiff's bad faith denial of post-conviction access to potentially exculpatory evidence. The court finds that summary judgment on this claim should be denied.

D.      Supervisor Liability - Macy

In his papers, Macy seeks summary judgment on plaintiff's claims to the extent they are based upon violations of the Fifth and Eighth Amendments.  Plaintiff, in response, represents that he is not pursuing claims under either amendment.  As plaintiff is not pursuing any such claims, and the court, at the motion to dismiss stage, *see*, doc. no. 47, dismissed any § 1983 claims alleged under the Fifth and Eighth Amendments, the court finds no need to address Macy's arguments relating to any such claims.[17]

Macy next contends that plaintiff cannot establish a malicious prosecution claim under § 1983.  As do the City and Gilchrist, Macy contends that the finding of probable cause at the preliminary hearing and the two District Court judges' opinions denying post-conviction relief after DNA testing eliminates plaintiff's claim.  However, the court, as previously discussed, has rejected the arguments that the judicial determination of probable cause at the preliminary hearing and the District Court's judge opinions require a finding that probable cause existed.  The court concludes that plaintiff's evidence establishes the absence of probable cause element of his § 1983 malicious prosecution claim.

As previously discussed, one of the essential elements of a malicious prosecution claim is favorable termination of the original action in favor of plaintiff.  Pierce, 359 F.3d at 1294.  Macy argues that plaintiff cannot show favorable termination because the dismissal of plaintiff's action by the District Court was without prejudice.  Citing Glasgow v. Fox, 757 P.2d 836 (Okla. 1988), Macy contends that the dismissal without prejudice does not qualify as a favorable termination

---

[17] Macy also seeks summary judgment on any § 1983 conspiracy claim.  The court dismissed this claim in its order addressing the motions to dismiss.  *See*, doc. no. 47.  The court therefore concludes that this claim is not viable.

because it did not "'reach the substantive rights of the cause of action and thereby vindicate [plaintiff] as to the underlying action." *Id*. at 839.

Although Bryson's case was dismissed without prejudice, the court concludes that the dismissal qualifies as a favorable termination. "'Criminal proceedings are terminated in favor of the accused by the formal abandonment of the proceedings by the public prosecutor.'" Wilkins, 528 F.3d at 802 (quoting Restatement (Second) of Torts § 659(c)(1977)). "[T]he inability of a prosecutor to prove a case beyond a reasonable doubt at trial can be consistent with the innocence of the accused and can be deemed a favorable termination in favor of the accused." *Id*. at 803. The court, in making its determination of whether the dismissal constitutes a favorable termination, must look at the stated reasons for the dismissal as well as the circumstances surrounding it in an attempt to determine whether the dismissal indicates innocence. *Id*. In the circumstances of this case, the state filed a motion to dismiss Bryson's case because "this case cannot go forward" and that the "evidence developed through DNA technology [] raises a doubt of the defendant's guilt which is reasonable." City's Ex. 87, pp. 6-7. It is clear to the court that the state's motion to dismiss shows an inability of the state to prove a case beyond a reasonable doubt against Bryson. Under the circumstances presented by this case, the court concludes quite easily that the state's lack of evidence to convict is consistent with a favorable termination. Although the District Court dismissed the case without prejudice, the court concludes that the circumstances surrounding the court's dismissal imply a formal abandonment of the criminal proceedings by the state and innocence on the part of Bryson. The court therefore concludes that the dismissal without prejudice satisfies the favorable termination requirement of the malicious prosecution claim. Wilkins, 528 F.3d at 804; *see also*, Restatement (Second) of Torts, § 659(c) and cmt. e (a formal abandonment

by the public prosecutor is also indicated, "for example, by a motion to dismiss the complaint.").

Macy also contends that summary judgment is appropriate because plaintiff cannot show that he personally participated in the alleged wrongful acts that violated plaintiff's due process rights under the Fourteenth Amendment. To establish supervisor liability under § 1983, a plaintiff must show that "an affirmative link exists between the [constitutional] deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir. 1988). According to Macy, there is no evidence that he personally participated in the fabrication of evidence.

Plaintiff, on the other hand, contends that Macy personally participated in the violation of plaintiff's due process rights because Macy advised law enforcement on the issue of forensic evidence (encouraging scientists not to be too cautious) and attempted to assure that the forensic evidence tilted his way by complaining when a law enforcement chemist or employee testified for the defense. See, e.g., Bryson's Ex. 84; Bryson's Ex. 44, p. 58, ll. 12-21 (Macy called the superiors of a Kansas City forensic chemist to get an agreement to not have their employees testify against Macy's forensic chemists); Bryson's Ex.44, p. 26, ll. 13-25, p. 27, ll. 6-10 (had discussion with Tom Bevel, who testified in blood splatter cases and employed by the police department, that testifying for defense was not appropriate).

The court concludes that the evidence offered by plaintiff is insufficient to show Macy's personal participation in the alleged malicious prosecution. The evidence does not establish that at the time of the alleged events in 1982 and 1983, Macy advised law enforcement, including Gilchrist, on the issue of forensic evidence or attempted to assure that forensic evidence tilted in favor of the prosecution, including

in the Bryson case. The court concludes that the evidence is not adequate to raise a genuine issue of material fact that he personally participated in the alleged constitutional deprivation.

Plaintiff also asserts that Macy is subject to § 1983 liability because he failed to train and supervise Gilchrist in the use of forensic evidence. A supervisor may be held liable where there is a failure to supervise or a "complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." Meade, 841 F.2d at 1527, 1528. According to plaintiff, Macy was a de facto supervisor of Gilchrist because his office funded her position. The court has carefully reviewed the affidavit of Janie Bates as well as Macy's testimony which plaintiff proffers to establish that Macy was Gilchrist's de facto supervisor. The court concludes that this evidence is insufficient to establish a genuine issue of material fact on this issue. Neither the affidavit nor the testimony establish that Gilchrist's position was funded by the District Attorney's office during late 1982 and early 1983. Ms. Bates' affidavit only establishes that it was sometime "during the 1980's." Plaintiff has also not presented any authority supporting the notion that the funding of Gilchrist's position by the District Attorney's office would make Macy a supervisor over Gilchrist and would require him to perform a quality control function with respect to Gilchrist's work. Macy did testify that he had a responsibility to make sure that the funding his office provided was well spent. The court, however, does not conclude that this testimony establishes that Macy was a de facto supervisor over Gilchrist. The court further concludes that the evidence of Deputy Chief Wilhelm's consultation with Macy about Wilson's complaint against Gilchrist does not show that Macy was a de facto supervisor. Although Macy may have had "a lot of sway" regarding Gilchrist, see, Bryson's Ex. 75 at p. 24, ll. 23-25, the court concludes that

the evidence is not sufficient to establish an obligation or duty to train and supervise Gilchrist and to implement quality controls with respect to her forensic work.

The Tenth Circuit has stated that a "failure to supervise is only actionable under § 1983 against a defendant who had a duty to supervise." Serna v. Colorado Dept of Corrections, 455 F.3d 1146, 1154 (10th Cir. 2006). The court concludes that because plaintiff has failed to present evidence sufficient to raise a genuine issue of fact as to whether Macy was Gilchrist's supervisor, Macy cannot be held liable under § 1983 based upon a failure to train or supervise Gilchrist. There has been no showing, sufficient even for Rule 56 purposes, that Macy was affirmatively linked with Gilchrist's alleged constitutional violations.

Plaintiff further contends that Macy is liable under § 1983 because he failed to train or supervise his subordinates in the District Attorney's office as to the use of forensic evidence and the use and evaluation of expert witnesses. In addition, he contends that Macy failed to establish any policies in regard to the use of forensic evidence and standards regarding the use and application of prosecutorial powers, including the requirement that prosecutors provide, without request, all matter which might tend to exonerate a defendant or lead to a lesser punishment. Macy, however, argues that he cannot be subjected to liability under § 1983 as he enjoys absolute prosecutorial immunity for the alleged failure to train or supervise and the alleged failure to establish policies. In support of his position, Macy relies upon the recent decision in Van de Kamp v. Goldstein, 129 S.Ct. 855 (2009). The plaintiff, in Van de Kamp, claimed that the district attorney and the chief deputy district attorney failed to adequately train and supervise their deputy district attorneys on the production of potential impeachment material about informants, and failed to create an information system for their deputy district attorneys containing potential impeachment material

about informants.  *Id*. at 861.  The Supreme Court found that absolute prosecutorial immunity barred the claims.  Notwithstanding that these claims addressed administrative functions, the Court found that they focused on "a certain kind of administrative obligation – a kind that itself is directly connected with the conduct of a trial."  *Id*. at 862.  The Court found these functions to be distinct from "administrative duties concerning . . . workplace, hiring, payroll administration, the maintenance of physical facilities, and the like" which are not given absolute immunity.  *Id*.  The Court concluded that the failure to supervise and train claims at issue relied upon underlying misconduct by the deputy prosecutors at trial, who were themselves entitled to absolute immunity.  *Id*.  As to the information system claim, the Court found that the absolute immunity applied, because "determining the criteria for inclusion or exclusion [in an information system] requires knowledge of the law" and if such claim were allowed, the court would have to "review the office's legal judgments."  *Id*. at 864.

The court finds that under <u>Van de Kamp</u>, Macy is entitled to absolute immunity from plaintiff's claim that he failed to train and supervise his subordinates.  As in <u>Van De Kamp</u>, the claims alleged address issues intimately associated with the judicial process – the use of forensic evidence, use and evaluation of expert witnesses and the handling of exculpatory evidence.  Any failure to train or supervise the subordinates with respect to these matters involves "a certain kind of administrative obligation–a kind that itself is directly connected with the conduct of a trial." <u>Van de Kamp</u>, 129 U.S. at 862.

There is evidence that after the OCCA vacated of the conviction, Macy publicly advised that Bryson would be retried and the same evidence would be used to convict.  City's Ex. 94.  The court, however, concludes that the decision to pursue the retrial

of the charges and to use the same evidence is "intimately associated with the judicial process" and Macy is entitled to absolute immunity for any actions in seeking a retrial. *See*, Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993) (a prosecutor's actions "which occur in the course of his role as an advocate for the State" receive absolute immunity).

In sum, the court finds that Macy is entitled to summary judgment on plaintiff's § 1983 claim against Macy based upon supervisory liability.

E.      Municipal Liability - City

Plaintiff also contends that the City is liable under § 1983 on the basis that the City failed to adequately train and supervise Gilchrist, thereby causing Gilchrist to deprive Bryson of his constitutional rights.

The mere fact that an employee of a municipality deprived a plaintiff of a federal right is not itself a sufficient basis for holding the municipality liable to the plaintiff. In Monell v. Dep't of Social Servs., 436 U.S. 658, 690-691 (1978), the Supreme Court held that in order to establish the liability of a municipality in a § 1983 action for the unconstitutional acts of a municipal employee below the policymaking level, a plaintiff must establish that the constitutional violation resulted from a municipal custom or policy. The municipality cannot be held liable under § 1983 solely because it employed the tortfeasor. *Id*. at 691 ("a municipality cannot be held liable under § 1983 on a *respondeat superior* theory").

A municipality may be responsible for a constitutional violation by a municipal employee when a municipality's failure to train its employee reflects a deliberate indifference to the plaintiff's constitutionality protected rights. City of Canton v. Harris, 489 U.S. 378, 389 (1989). That failure to train may "be properly thought of as [municipal] policy . . . [and] is actionable under § 1983." *Id*.

In Canton, the Supreme Court imposed strict limitations on municipal liability under § 1983 for lapses in training:

> We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.  This rule is most consistent with our admonition . . . that a municipality can be liable under § 1983 only where its policies are the moving force behind the constitutional violation.  Only where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983 . . . . Only where a failure to train reflects a deliberate or conscious choice by a municipality-a policy as defined by our prior cases-can a city be liable for such a failure under § 1983.

Canton, 489 U.S. at 388-389 (internal citations, quotation marks, and brackets omitted).  The Tenth Circuit cases understandably treat allegations of failure to supervise the same way.  See, Medina v. City and County of Denver, 960 F.2d 1493, 1500 (10th Cir. 1992); Schepp v. Fremont County, 900 F.2d 1448, 1454 (10th Cir.1990); Meade v. Grubbs, 841 F.2d 1512, 1527-28 (10th Cir.1988).

In order to prevail on a claim against a municipality for failure to train or supervise, plaintiff must first prove[18] that the training or supervision was in fact inadequate, and then satisfy the following requirements:

> (1) Gilchrist's actions violated his constitutional rights:
> (2) the violation arose under circumstances that were usual and recurring situations for the City's forensic chemists;

---

[18] Of course, plaintiff need not actually "prove" anything to defeat summary judgment.  He must merely demonstrate the existence of a genuine issue of material fact.

> (3) the inadequate training or supervision demonstrates
> deliberate indifference to criminal suspects; and (4) there is
> a direct causal link between the constitutional deprivations
> and the inadequate training or supervision.

Carr v. Castle, 337 F.3d 1221, 1228 (10th Cir. 2003); Pierce v. Gilchrist, 2007 WL 162522 (W.D. Okla. January 18, 2007).  In this case, plaintiff's evidence is sufficient to raise a genuine issue of material fact as to the inadequacy of both the City's training and supervision of Gilchrist.  The court additionally finds that plaintiff can satisfy, for summary judgment purposes, the first two enumerated requirements.  As for the first factor, the court has already found, as previously discussed in this order, that plaintiff can establish Gilchrist violated his constitutional rights.  And as for the second factor, the court concludes that the alleged violation occurred under circumstances that were usual and recurring situations for forensic chemists, i.e. analyzing forensic evidence and reporting the results thereof for a criminal case.

With regard to the third factor, the Tenth Circuit has written as follows as to the showing plaintiff must make to establish a claim of deliberate indifference:

> The deliberate indifference standard may be satisfied when
> the municipality has actual or constructive notice that its
> action or failure to act is substantially certain to result in a
> constitutional violation, and it consciously or deliberately
> chooses to disregard the risk of harm. In most instances,
> notice can be established by proving the existence of a
> pattern of tortious conduct. In a narrow range of
> circumstances, however, deliberate indifference may be
> found absent a pattern of unconstitutional behavior if a
> violation of federal rights is a highly predictable or plainly
> obvious consequence of a municipality's action or inaction,
> such as when a municipality fails to train an employee in
> specific skills needed to handle recurring situations, thus
> presenting an obvious potential for constitutional violations.

Carr v. Castle, 337 F.3d at 1229.

Viewing the record and drawing reasonable inferences in favor of plaintiff, the court finds insufficient evidence to raise a jury question as to the third factor. The evidence does not support a finding that the City acted with deliberate indifference. On the failure to train theory, there is no evidence of any previous incidents involving fabrication of evidence by one or more City chemists prior to 1980 or from 1980 to 1983. The record is devoid of any complaints or criticisms about a City chemist's work performance during this same time period. Consequently, the court concludes that plaintiff cannot show notice on the part of the City, through a pattern of tortious conduct, that its training program was deficient and that its failure to implement more or different was substantially certain to result in a violation of Bryson's constitutional rights.

The court also finds that this case does not fall within the "narrow range of circumstances" justifying a finding of deliberate indifference absent a pattern of violations. Carr, 337 F.3d at 1229. The court concludes that the evidence in the record fails to show that the need for more or different training was so obvious and the inadequacy so likely to result in the deprivation of Bryson's constitutional rights, that the City can be said to have been deliberately indifferent to the need. Allen v. Muskogee, 119 F.3d 837, 842 (10th Cir. 1997) (quoting Canton, 489 U.S. at 390). The court cannot say on the record before it that Gilchrist's fabrication of evidence was a "highly predictable or plainly obvious consequence" of the City's alleged inadequate training program. Carr, 337 F.3d at 1229.

As to the failure to supervise theory, the court finds, as with the failure to train theory, that there was no pattern of tortious conduct to put the City on notice that its

supervision was inadequate or that the inadequacy was substantially certain to result in a violation of Bryson's constitutional rights.  Again, there is no evidence of any complaints or criticisms of the work of any City forensic chemists prior to 1980 or from 1980 to 1983.  Such absence of evidence makes this case distinguishable from the Pierce v. Gilchrist case, wherein the court found that by 1986, the relevant time period in that case, the OCPD had been alerted to serious deficiencies in Gilchrist's analysis and questions about her professionalism, in more than one case, and had taken no action in response.  In this case, there is no evidence of any criticism of Gilchrist's analysis of forensic evidence or of any questions about her professionalism during the relevant time period.  Indeed, Pearson, Bryson's trial counsel, testified in deposition that "Gilchrist's reputation was not – had not been attacked" and "there [were] no suspicions in 1983."  City's Ex. 34, p. 101, ll. 15-19.  There is no evidence of any complaints or criticisms of other chemists.  The court therefore concludes that there is no evidence of a pattern of tortious conduct that would have put the City on notice of its inadequate supervision or that the inadequacy was substantially certain to result in the deprivation of Bryson's constitutional rights.

The court also finds that this case is not within the "narrow range of circumstances" alluded to by the Court of Appeals in Carr.  The court concludes that there is insufficient evidence for a reasonable jury to conclude that it was highly predictable or plainly obvious that the alleged failure to supervise and implement quality controls, i.e., peer review, would have led to the constitutional violation suffered by Bryson at the hands of Gilchrist.

Because the court concludes that the evidence in the record is insufficient to demonstrate the deliberate indifference requirement of the failure to train and supervise

claims, the court finds that the City is not liable under § 1983 for the alleged failure to train or supervise.  Summary judgment in favor of the City is therefore appropriate.

  F.  State Law Claim Against Gilchrist

  Plaintiff has alleged a state law claim against Gilchrist for negligence resulting in wrongful conviction.  Gilchrist contends that she is entitled to summary judgment on this claim because she was acting within the scope of her employment when the alleged wrongful conduct occurred.  Under the Governmental Tort Claims Act, the City, as Gilchrist's employer, is liable, exclusively, for any loss resulting from Gilchrist's alleged tort if it was committed while she was acting within the scope of her employment. 51 O.S. 2001 § 153, Nail v. City of Henryetta, 911 P.2d 914, 916 (Okla. 1996).  However, an employee may be held liable for an alleged tort if the tort was committed while acting outside the scope of employment.  *Id*.  An employee is not acting within the scope of her employment if she "acted maliciously, or in bad faith." *Id*.; 51 O.S. 2001 152(9) (defining scope of employment as "performance by an employee acting in good faith within the duties of [her] office or employment or of tasks lawfully assigned by a competent authority. . . .")  Gilchrist contends that she was acting in good faith.  She argues that there is no evidence that she acted maliciously or in bad faith.  Further she contends that plaintiff concedes that she was acting within the scope of her employment because he maintains that she was acting under color of state law for purposes of the § 1983 claim.

  The question of whether an employee was acting within the scope of her employment is normally a question for the jury, except in cases where only one reasonable conclusion can be drawn.  Nail, 911 P.2d 918.  Viewing the facts in a light most favorable to plaintiff, and drawing reasonable inferences from those facts, the court cannot conclude that only one reasonable conclusion can be drawn from the

evidence.  The court concludes that a genuine issue of material fact exists as to whether Gilchrist was acting within the scope of her employment.  The court rejects Gilchrist's argument that she was acting within the scope of her employment if she was acting under the color of state law for § 1983 purposes.  *See*, *e.g.* Brown v. Gray, 227 F.3d 1278, 1290 & n.7 (10th Cir. 2000); Houston v. Reich, 932 F.2d 883 (10th Cir. 1991).

G.    State Law Claim Against Macy

In the "Conclusion" portion of his brief, Macy asserts that "he is entitled to summary judgment in his favor on all claims."  *See*, doc. no. 108, p. 38.  As previously stated, plaintiff has alleged a state law claim against Macy.  As is the case with Gilchrist, this claim is a claim of negligence resulting in wrongful conviction.  Unlike Gilchrist, however, Macy presents no developed argument challenging that claim.  He only challenges his liability with respect to the § 1983 claims.  The court declines to address the merits of the claim without a specific challenge from Macy.  This claim therefore proceeds to trial.

H.    Cross-Claim Against City

In addition to her answer filed on March 21, 2007, Gilchrist filed a cross-claim against the City seeking indemnification for damages, fees and costs and a defense.  The City has answered the cross-claim.  Neither Gilchrist nor the City has addressed the cross-claim in the summary judgment motions.  The cross-claim therefore remains at issue for resolution.

V.  Conclusion

Based upon the foregoing, Defendant City of Oklahoma City's Motion for Summary Judgment, filed January 8, 2009 (doc. no. 105), is **GRANTED**.  Gilchrist's cross-claim against the City remains at issue.  Defendant Robert H. Macy's Motion for Summary Judgment, filed January 9, 2009 (doc. no. 107), is **GRANTED** with respect

to the claims challenged in that motion, as discussed above.  However, as the state law claim against Robert H. Macy was not challenged by his motion, that claim remains for trial.  The Motion for Summary Judgment by Defendant, Joyce Gilchrist, filed January 9, 2009 (doc. no. 110), is in all respects  **DENIED**.

DATED April 30, 2009.


_____

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE


05-1150p036(pub).wpd

55